O35RZIO1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

ZIONESS MOVEMENT, INC.,

                    Plaintiff,

          v.                          21-CV-07429 (AKH)

THE LAWFARE PROJECT, INC.,
                                      Trial
                    Defendant.

------------------------------x
                                      New York, N.Y.
                                      March 5, 2024
                                      10:00 a.m.

Before:

                    HON. ALVIN K. HELLERSTEIN,

                                      District Judge
                                          -and a Jury-


                         APPEARANCES

FELICELLO LAW, P.C.
      Attorneys for Plaintiff
BY:   ROSEANNE E. FELICELLO
      KRISTIE M. BLASE
      MICHAEL J. MALONEY

OVED & OVED LLP
      Attorneys for Defendant
BY:   AARON SOLOMON
      DARREN OVED
      TIMOTHY SAVITSKY

ALSO PRESENT:   JARROD BERNSTEIN
                ZIPORAH REICH

O35RZIO1

```
1              (In open court)

2              THE COURT:  Good morning, everyone.  Any questions

3    before we begin?  Please be seated.

4              MS. FELICELLO:  Your Honor, we do have some

5    housekeeping matters to take care of.

6              THE COURT:  I can't hear you.  You need to speak --

7              MS. FELICELLO:  Sorry.  We do have some housekeeping

8    matters to take care of.

9              THE COURT:  We'll take care of them right now.

10             MS. FELICELLO:  Okay.  The first one is very minor,

11   your Honor.  My partner Michael Maloney may have to step out

12   during some of the proceedings.  Just wanted to let you know.

13             THE COURT:  I don't care.  He doesn't need my

14   permission.  We don't have any passkeys to go to the bathroom

15   here.

16             MS. FELICELLO:  Thank you, your Honor.  In docket 1888

17   that you recently issued, we said that we would deal with

18   adverse inferences at trial.  You had already made a

19   determination about some adverse inferences in docket 120, and

20   plaintiff relied on those adverse inferences in both preparing

21   for trial and preparing the proposed jury instructions.  We'd

22   like to discuss those with you.

23             THE COURT:  Witnesses will be appearing, right?

24             MS. FELICELLO:  Witnesses will be appearing, yes, your

25   Honor.
```

O35RZIO1

1              THE COURT:  Both sides consented to that, right?

2              MS. FELICELLO:  Excuse me?

3              THE COURT:  Both -- who is shaking their head at me?

4              MR. OVED:  That's me.

5              THE COURT:  Do I need you to shake your head to say

6    I'm right or wrong?

7              MR. OVED:  Sorry, your Honor.

8              MS. FELICELLO:  Your Honor, the adverse inferences had

9    to do with the ownership of the trademark and the separate --

10             THE COURT:  Don't mention trademark.  It has to do

11   with what goes on at trial.  That's the subject of testimony by

12   Amanda Berman and by Brooke Goldstein.

13             MS. FELICELLO:  Yes, your Honor.

14             THE COURT:  I'll get to adverse inferences if and when

15   the issue arises, but I can't tell you anything in advance

16   about it.

17             MS. FELICELLO:  Okay.  Can I just direct your

18   attention, your Honor, to docket 120 in which you ordered that

19   ZMI is entitled to the inferences that LPI and ZMI functioned

20   as independent entities.

21             THE COURT:  Because there was an absent witness but

22   now the witness is here.

23             MS. FELICELLO:  No, your Honor that was related to

24   sanctions on The Lawfare Project because of their failure to

25   produce a competent witness.

O35RZIO1

| | |
|---|---|
| 1 | THE COURT:  But now the witness is coming, right. |
| 2 | MS. FELICELLO:  I assume that their witness will be |
| 3 | appearing, your Honor. |
| 4 | THE COURT:  Yeah, you consented to it. |
| 5 | MS. FELICELLO:  I did not consent. |
| 6 | THE COURT:  What else do you have? |
| 7 | MS. FELICELLO:  Okay.  There's a few other things.  We |
| 8 | would like to discuss the proposed jury instructions. |
| 9 | THE COURT:  Not at this time. |
| 10 | MS. FELICELLO:  Okay. |
| 11 | THE COURT:  That will be when it's time for it. |
| 12 | MS. FELICELLO:  Just one clarity on the docket 120, |
| 13 | are you rescinding that order you issued in docket 120? |
| 14 | THE COURT:  What is docket 120? |
| 15 | MS. FELICELLO:  That's the adverse inference order -- |
| 16 | THE COURT:  Didn't I just tell you what I'm going to |
| 17 | do with adverse inference. |
| 18 | MS. FELICELLO:  I just wanted to make clear -- |
| 19 | THE COURT:  Don't make clear.  Did you hear what I |
| 20 | said? |
| 21 | MS. FELICELLO:  Yes, your Honor. |
| 22 | THE COURT:  What else? |
| 23 | MS. FELICELLO:  I wanted to see if the witnesses are |
| 24 | going to appear 40/20 or have the witness appear once with each |
| 25 | party taking their turns. |

O35RZIO1

| 1 | THE COURT:  Have you had a trial before?

| 2 | MS. FELICELLO:  Yes, your Honor but different judges

| 3 | handle it different ways.

| 4 | THE COURT:  We go according to a trial.  When one side

| 5 | finishes then the other one starts.

| 6 | MS. FELICELLO:  Thank you, your Honor.  We have two

| 7 | demonstratives that we like to use, one in the opening, one in

| 8 | the closing.  How would your Honor like --

| 9 | THE COURT:  Just show me after jury selection and make

| 10 | sure your adversary sees it.

| 11 | MS. FELICELLO:  Okay.  Thank you.  We have binders of

| 12 | exhibits.  Would you like for those to be presented to the jury

| 13 | or how would you like to handle that?

| 14 | THE COURT:  You have what?

| 15 | MS. FELICELLO:  Binders full of exhibits.

| 16 | THE COURT:  Give them to my law Clark.

| 17 | MR. COLEMAN:  Okay.  There's two witnesses that we

| 18 | understand will be remote, your Honor.

| 19 | THE COURT:  Brooke and Ms. Jones.

| 20 | MS. FELICELLO:  Okay.  Thank you.  We attempted to

| 21 | reach agreement with opposing counsel on some of the objections

| 22 | to the exhibits -- but we were unable to -- they didn't respond

| 23 | to our --

| 24 | THE COURT:  I'll take the objections as they came in.

| 25 | MS. FELICELLO:  Excuse me?  I didn't hear you.

O35RZIO1

| | |
|---|---|
| 1 | THE COURT:  I'll take the objections as they come in. |
| 2 | Are we ready for the jury? |
| 3 | MS. FELICELLO:  Are the exhibits that are not objected |
| 4 | to deemed admitted, or are you still going to rule on them, |
| 5 | your Honor? |
| 6 | THE COURT:  I don't know.  I'll rule on them as they |
| 7 | come in. |
| 8 | MS. FELICELLO:  Okay.  I think that's all I had on my |
| 9 | list.  Thank you, your Honor. |
| 10 | THE COURT:  Yes, sir. |
| 11 | MR. SOLOMON:  Good morning, Judge.  One issue is that |
| 12 | Brooke Goldstein from Lawfare, her son fell ill last night so |
| 13 | she didn't fly in this morning, she's flying in later.  Is it |
| 14 | possible for her to observe today via Zoom. |
| 15 | THE COURT:  No.  We'd have to set it up. |
| 16 | MR. SOLOMON:  That's fine, Judge, thank you. |
| 17 | THE COURT:  If we have to take the testimony today |
| 18 | because you told me that witness can't come today and it's the |
| 19 | first witness.  We're going to have jury selection and openings |
| 20 | today, and start the testimony at 10:00 tomorrow morning. |
| 21 | (Continued on next page) |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

O35RZIO2

1       (A jury of eight was impaneled and sworn)

2       THE COURT:  Did you all say "I do"?

3       JUROR:  I do.

4       JUROR:  I do.

5       JUROR:  I do.

6       JUROR:  I do.

7       THE COURT:  All right.  As I told you previously, your

8  function is going to be to be the triers of fact.  You will

9  listen to all the evidence in the case, and based on all the

10  evidence and my legal instructions, you will then be able to

11  come to a true verdict.  I will not interfere with your being

12  the triers of fact, and you have to take the law as I give it.

13       A general word about evidence:  There are two kinds,

14  direct and circumstantial.  Contrary to what you may have

15  heard, each category of evidence is worthy of the same kind of

16  attention as everyone else.  And there can be strong

17  circumstantial evidence and weak circumstantial evidence,

18  strong direct evidence and weak direct evidence, and mistaken

19  direct evidence and improper inferences.  It's all a mix.  We

20  depend on you, the jury, to bring your common sense and your

21  experience in life to bear to find out which witnesses are

22  credible and which are not, which inferences should be made and

23  which should not.  There's no inherent strength or weakness to

24  evidence.  Each type of evidence has its own strength and its

25  own weakness.

O35RZIO2

1          Direct evidence is that which we see or hear or read,

2     that appeals directly to our senses, and we can report that.

3     Circumstantial evidence is evidence that we reason from some

4     other type of evidence.  For example, if all the shutters are

5     closed and someone comes in dripping with rain, with water, you

6     can assume it was raining outside.  That's circumstantial

7     evidence.  As I say, each can be strong and each can be weak,

8     and I'll give you rules at the end of the case for deciding the

9     credibility of the witnesses and the inference to take from

10    witnesses.

11         Now, it's very important to follow a number of rules.

12    First, evidence is here in the courtroom, not outside the

13    courtroom.  Do not do any research on the internet or anywhere

14    else.  You'll be hearing about trademarks.  Don't look them up.

15    You'll be hearing from different witnesses.  Don't look them

16    up.  Everything will come that you need to decide in this

17    courtroom.  Now, why do we say that?  We say that because every

18    piece of evidence here, for a number of reasons, can be checked

19    and cross-examined by the lawyers.  So you have the benefit of

20    their history with this case, their experience with this case

21    and their ability to question witnesses on the case, so it's

22    better to be able to separate what is exaggerated, what's real,

23    what's true and what is not.  That's the first reason.

24         The second reason is that you are all equal.  No juror

25    is entitled to more judgment because that juror may have

O35RZIO2

17 degrees as opposed to someone who has no degrees.  You each

have your common sense in which to deliberate and work

together.  No juror is an expert as to any other juror.  You

are all equal.  Now, if someone does research and reports to

that jury, that person becomes a witness, not a juror, and

tries to abrogate weight and experience to himself than anyone

else because he has more knowledge.  He gained it on the

internet.  No, no.  You're equal, and you cannot bring any kind

of knowledge of something else and some kind of subject into

the jury room.  All the evidence that you need, all the

information that you need will come from here.

Now, as the evidence comes in, lawyers will object.

They're entitled to object, and I'll rule on the objections.

The lawyers can only say one word.  They will say, "Objection."

They are not going to give any speeches.  It's not going to be

like television.  No lawyers will give a speech unless in

opening or in closing.  If you object, it's one word.  You

stand up, "Objection."  I'll rule.  There will be no sidebars

unless I need them.  If I don't need a sidebar, you can ask for

it.  I'm not going to give it to you.

This trial will be efficient.  I understand that you

are giving time from your lives, so we'll have an efficient

trial, and I hope an interesting trial so that you can look

upon this experience as a valuable experience in your life, and

you will be doing justice to the parties.  There's no higher

O35RZIO2

calling in this country, in this democracy with all its troubles, than doing justice, doing justice between two people in a controversy, finding the facts and ruling according to the law.

Evidence comes in piecemeal. You'll hear one witness, another witness. They may not all be in a chronology, and they may not fit together until the end of the case. Your job is to keep an open mind; open until the very end of the case, until all the evidence is in, until you've heard the summations of the lawyers, and you hear my legal instructions. It's very important. Because if you try to summarize the case or feel that you have a handle on the case before its finished, you tend to close up your mind to the process, and you try to look for ways supporting your reasons. So you must keep an open mind.

The second thing, don't discuss the case with anyone else, and don't discuss the case amongst yourselves until it's over. Then it will be time for deliberating. Again, when you tend to talk about the case, you tend to reach certain conclusions in your mind and your mind will start to close if it's not open and fair and impartial to the very end. So don't do research. Don't engage in conversations about the case, not with anyone else.

Now, you may be on social media, and if you say I've got this case and you talk about it, other people will talk to

O35RZIO2

you about it.  And so, again, it's a danger that your mind will

close up or be influenced by information outside of this jury

room.  Don't use social media in any way having to do with this

trial during this case.  I doubt that there will be any

newspaper references.  If there are, don't pay attention to

them.  Or radio references or TV references, don't pay

attention to them.  The only important thing is coming out of

this jury box and the documents that come into evidence.

Now, we will begin our day at 10:00 a.m.  We cannot

begin until every one of you jurors is here and the lawyers are

here as well.  So if anyone is late, everyone will be late and

we impose on everyone else.  So we must be on time.  Those of

you who travel from a distance, or even a short distance and

use buses and subways, know that they are prone to delay.

Account for that because if you are delayed, it imposes on

everyone else.  If it's inevitable and you are delayed,

Ms. Jones will give you a telephone number to call so you can

let us know.  And she will take your number so in case we have

to communicate with you, we'll be able to do that.

The lawyers and the parties are not to talk to you,

not even to say, hello or goodbye or how are you.  If they see

you in the elevator, they must exit the elevator.  There must

be no contact between the lawyers and anyone on the jury.  We

concern ourselves not only with justice but with the appearance

of justice as well.  The lawyers will address you formally in

O35RZIO2

1    court and nowhere else.  And it's important for you not to

2    gather anywhere.  If you come early, go directly into the jury

3    room.  We're going to try and have coffee for you, and you wait

4    in the jury room.  Do not linger in the hallways, and do not

5    make eye contact or do anything else with the lawyers.

6              Today we're going to hear the openings of the lawyers.

7    Tomorrow we'll start with the witnesses.  And as I said, we

8    will not be working on Friday.  Today is Tuesday, we'll be

9    working today in a very limited way and tomorrow and Thursday.

10   On Thursday, we're going to have to stop at 4:00.  We've got 45

11   minutes to lunchtime.  I think we can have the openings now and

12   then we'll break, and you'll be able to go home for the day and

13   come back tomorrow at 10:00.

14             Is that a good plan?  Yes?

15             JUROR:  Sorry, I missed this before.  You think it's

16   going to take like a week, you said?  Around there?

17             THE COURT:  Say again.

18             JUROR:  How long do you think we'll be here for the

19   whole trial?  A week, I think you said.

20             THE COURT:  About seven days.

21             JUROR:  I'm sorry.  I think you addressed this, but if

22   I'm unavailable the week of the 18th --

23             THE COURT:  Sorry?

24             JUROR:  If I'm unavailable the week of the 18th?

25             THE COURT:  We're not going that far.  We'll be

O35RZIO2

1    finished before that.

2           Ms. Jones, are you giving out the notebooks?

3           THE DEPUTY CLERK:  Can I get ten minutes and bring

4    them into the back?

5           THE COURT:  We're going to give you notebooks so those

6    of you that want to take notes can take notes.  If you take

7    notes, they are only for yourself.  You cannot prove a point to

8    another juror through your notes.  Your notes are just useful

9    as a reminder to yourself.  Some people are good at taking

10   notes.  Some people, not so good.  Some people just prefer to

11   hear the testimony rather than take notes.  For some, it helps

12   you to hear; others, it gets in the way.  You do what is good

13   for you.  Those of you who take notes, take notes.

14          If you have questions about the jury, about the things

15   that come up, you can send me a note or ask me.  This trial is

16   to give you information.  The problem about that is that the

17   lawyers know what they are going to do and something comes up

18   in sequence, it's not always the right sequence.  But if you

19   have questions, you can ask me.  We'll run a trial that will

20   give you the information you need to make an informed judgment.

21          I don't think I've charged you about preponderance of

22   the evidence.  I will at the end, but I might as well tell you

23   about it now.  A civil case is decided by a preponderance of

24   the evidence.  If you think of a scale, a weight scale, the

25   person who has to prove a point has to prove it to tip the

O35RZIO2

1    scale ever so slightly.  If the person fails to tip that scale,

2    the person has failed in its burden of proof.  If it's equal,

3    it does not prove the point.  You have to tip the scale ever so

4    slightly to prove a point by a preponderance of the evidence.

5    The plaintiff has a burden to prove the case by a preponderance

6    of the evidence, but if there are defenses in the case,

7    sometimes defendant will have a burden with regard to a

8    defense.  We'll get to that at the end of the case, and I'll

9    instruct you.

10           Ms. Jones needs a couple of minutes to get you the

11   notebooks, and then we'll hear the openings of the lawyers.

12   And then we'll break for lunch, and you'll have the rest of the

13   day free.

14           Yes?

15           MR. OVED:  Your Honor, perhaps we could have a sidebar

16   addressing the --

17           THE COURT:  I can't hear you.

18           MR. OVED:  Perhaps we can have a sidebar addressing

19   the exhibit they want to show the jury at the opening, the

20   demonstrative aid.

21           THE COURT:  Take the podium.  I'm not able to hear

22   you.

23           MR. OVED:  I said, while the jury is taking their

24   attendance, perhaps we can have a sidebar to address that

25   demonstrative aid that was presented to us.

O35RZIO2

| | |
|---|---|
| 1 | THE COURT:  All right.  Yes.  Come in the robing room. |
| 2 | You can stay in your place.  We'll be finished with this in |
| 3 | five minutes. |
| 4 | THE DEPUTY CLERK:  Judge, I'm going to take the jury |
| 5 | in the back. |
| 6 | THE COURT:  You want to go in the back? |
| 7 | THE DEPUTY CLERK:  Yes. |
| 8 | THE COURT:  Okay.  Go with Ms. Jones.  Don't discuss |
| 9 | the case.  Drew will pick up the questionnaires. |
| 10 | Be seated, please.  Did you lose something? |
| 11 | JUROR:  Yes.  It's okay.  Thank you. |
| 12 | (Jury not present) |
| 13 | THE COURT:  Let's get to the demonstratives. |
| 14 | MS. FELICELLO:  Should we put it on the screen, your |
| 15 | Honor? |
| 16 | THE COURT:  That's going to be in evidence, isn't it? |
| 17 | MS. FELICELLO:  Yes.  It's from Plaintiff's |
| 18 | Exhibit 60. |
| 19 | THE COURT:  What do you want to do with it? |
| 20 | MS. FELICELLO:  We have it blown up as a cardboard. |
| 21 | We would like to show it to the jury in my opening. |
| 22 | THE COURT:  Any objection? |
| 23 | MR. SOLOMON:  Yes, Judge.  It's not a demonstrative. |
| 24 | It's not used to be a presentation of evidence.  It's an |
| 25 | excerpt of Plaintiff's Exhibit 60, and it's -- |

O35RZIO2

1        THE COURT:  Your objection is sustained.  This will be

2   evidentiary, and it will come in.  The purpose of an opening is

3   not to prove the case, it's to inform the jury how the case

4   connects one to the other.  You'll have time to do that at the

5   end.

6        MS. FELICELLO:  Okay.  Thank you.

7        MR. SOLOMON:  Thank you, Judge.

8        THE COURT:  Anything else?

9        MS. FELICELLO:  Not at this time.

10        MR. SOLOMON:  Nothing for the defense.

11        MS. FELICELLO:  One thing, your Honor.  Is it possible

12   to have a microphone at the bench because it's really difficult

13   for all of us to hear you?

14        THE COURT:  I'll put on my microphone.

15        MS. FELICELLO:  Thank you, your Honor.

16        THE COURT:  I am sorry about that.

17        MR. OVED:  Thank you.  I will say, your Honor, that

18   your hearing must be impeccable because you have no problem

19   hearing anybody here, and I can't hear anybody.  It's amazing.

20        THE COURT:  It's not so good.

21        (Pause)

22        THE DEPUTY CLERK:  Are you ready, Judge?

23        THE COURT:  Ready.

24        THE DEPUTY CLERK:  I'll bring them out in a second.

25        (Jury present)

O35RZIO2                              Felicello - Opening

1           THE COURT:  How long will your opening be?

2           MS. FELICELLO:  About 15 to 20 minutes, your Honor.

3           THE COURT:  And how long will yours be, Mr. Solomon?

4           MR. SOLOMON:  I'll do the opening, your Honor, about

5   15 minutes.

6           THE COURT:  Would you want to have lunch and come back

7   because this can run to, you know, 1:30 or 2:00.

8           JUROR:  We're fine with doing it now.

9           THE COURT:  Okay.  Go ahead.

10          MS. FELICELLO:  May I approach the podium?

11          MS. FELICELLO:  Good afternoon, your Honor, ladies and

12  gentlemen of the jury.  My name is Roseanne Felicello, and I,

13  together with my team, represent Zioness Movement, Inc.

14          As Judge Hellerstein mentioned to you, this a

15  trademark infringement matter.  I'll will not describe for you

16  some of the key facts that will be coming into evidence in this

17  matter through the witness and documents that you'll see.  As

18  you listen to the testimony and review the documents, I want

19  you to keep one thing in mind:  Not any witness is going to

20  have the full story or provide all of the evidence that you

21  will need to reach a conclusion in this matter in favor of

22  Zioness on its claims.  Rather, each witness, each document is

23  like a piece of a puzzle, and it will be at the end of the

24  proceeding that we'll put the pieces together and see the

25  evidence clearly and see that Zioness has proven its claims.

O35RZIO2                        Felicello - Opening

1    Some pieces of the puzzle are obviously larger and more

2    important in the matter than others, but no one piece is

3    complete.

4              I will start now by describing how those pieces -- how

5    some of those pieces fit together, but it will be at the end of

6    trial that I'll speak to you again and put it all together for

7    you.  The first question that you might have is:  What is

8    Zioness Movement?  It's a nonprofit, New York entity, and the

9    evidence will show that it was established by Amanda Berman in

10   February 2018.  It's a progressive and Zionist organization

11   that educates and motivates.  Ms. Berman and her team engage in

12   speaking engagements, write op-eds and promote the idea of

13   Zioness.

14             You will hear that the Zioness Movement operates with

15   its own board of directors, submits its own tax returns,

16   maintains its own financial accounts and is a completely

17   independent organization.  The evidence will also show that

18   Zioness Movement applied for a trademark in the word "Zioness"

19   back in April 2018.  The mark was then published for opposition

20   by the United States Patent and Trademark Office, and no

21   opposition was submitted to the mark.  In due course, in

22   May 2020, the U.S. Patent and Trademark Office registered the

23   trademark to Zioness Movement, Inc.

24             With that background, you might be wondering why

25   you're here to help resolve a dispute about the ownership of

O35RZIO2                    Felicello - Opening

1    the trademark Zioness.  Let me explain.  You will hear claims

2    by defendant, The Lawfare Project, that it owns the trademark

3    in Zioness rather than Zioness Movement.  So what is The

4    Lawfare Project and what is its relationship to Zioness?  The

5    evidence will show that The Lawfare Project is a not-for-profit

6    District of Columbia entity.  It operates as a nonprofit law

7    firm, and it was established by Brooke Goldstein, who was its

8    founder and executive director.  Ms. Goldstein a public figure

9    known for her conservative views, who frequently appears in the

10   media.  The evidence will show that the law firm brings

11   lawsuits in favor -- in support of Jewish rights.

12          The evidence will also show that from March 2015 to

13   December 31, 2018, Amanda Berman worked as an employee at The

14   Lawfare Project.  She was an attorney for The Lawfare Project,

15   and she was the main attorney for The Lawfare Project working

16   on an important case that The Lawfare Project had brought in

17   connection with issues happening at the San Francisco State

18   University.  That matter was gearing up for trial in March of

19   2019.  You will also hear that Amanda's employee agreement with

20   The Lawfare Project specifically permitted her to work on

21   outside pursuits during her employment at Zioness -- sorry, at

22   The Lawfare Project.

23          Where does Zioness fit in?  The evidence will show

24   that the first time the word "Zioness" was used as a brand was

25   when Amanda and Brooke together, and about a dozen others who

O35RZIO2                    Felicello - Opening

1    were unrelated to The Lawfare Project, attended what is called

2    SlutWalk in Chicago in August 2017.  What is SlutWalk?  I

3    didn't know what it was either before I started working on this

4    case.  The SlutWalk is a progressive demonstration against rape

5    culture.

6            The evidence will show that the organizers of the

7    SlutWalk had previously said that Stars of David were not

8    allowed at the walk, that participants in the walk couldn't

9    wear the Jewish symbol and also participate in this progressive

10   walk against rape culture.  Soon -- a few days prior to the

11   walk, they relented and said, Okay, you can wear your Stars of

12   David.  And based on that, Amanda, who the evidence will show

13   is a progressive, comes from a progressive background, saw an

14   opportunity to bridge a gap by participating in the event as

15   progressive Zionists.

16           Amanda and Brooke decided to recruit some others to

17   join them under the Zioness brand and to march as a core unit

18   in support of Zioness also wearing the Stars of David and

19   branding related to Zioness.  They did not have any attire or

20   insignia referencing The Lawfare Project.  They never promoted

21   themselves while they were there as being members of the

22   Lawfare Project or employees of The Lawfare Project.  And the

23   evidence will show that there was no connection between their

24   appearance at the SlutWalk and their work for The Lawfare

25   Project, which, again, is a nonprofit law firm, not a protest

O35RZIO2                    Felicello - Opening

organization.  The Lawfare Project did not pay for Amanda's
time to attend the SlutWalk event, and Amanda and Brooke told
the then chair of The Lawfare Project, Lawrence Hill, that
their attendance was for Zioness, not Lawfare Project.  After
their appearance at the SlutWalk, which gained a lot of
attention in the media, interest in the idea of Zioness grew.
The evidence will show that there seemed to be a need for this
progressive and Zionist pro-female organization to exist and
donors were interested.

           At the beginning, you will hear evidence that Brooke
caused The Lawfare Project to provide -- to advance some of the
early costs associated with the Zioness Movement for t-shirts,
things like that.  But the evidence will also show that Amanda
was always the face of Zioness, and media coverage portrayed
her as the founder with no objection by Brooke.  You will hear
that Brooke attended one other event as part of Zioness in
October 2017, but that she then soon lost interest.  And by
November 2017, Brooke told Amanda that Lawfare was not going to
advance any additional costs, all costs that had been advanced
would need to be repaid.  Once Amanda went out and set up this
organization, which she also recognized and Amanda was planning
to do.  Amanda agreed, and you will see documents showing that
Amanda requested an accounting from the Lawfare Project as to
what was owed so The Lawfare Project could be paid back.  That
accounting was never provided.

O35RZIO2                         Felicello - Opening

1          The evidence will also show, also, in 2019 Amanda

2     continued to work at The Lawfare Project and also continuously

3     continued to build up Zioness Movement.  She registered Zioness

4     Movement, as they discussed, as a separate entity in

5     February 2018.  She formed an independent board of directors.

6     There was no overlap between the board of directors of Zioness

7     Movement and The Lawfare Project.  She opened a bank account

8     over which no one at Lawfare Project had any control, and she

9     began to raise money for Zioness.  All of this was out in the

10    open.  The evidence will show that Brooke Goldstein and the

11    board of directors of the Lawfare Project were aware of these

12    activities and generally supportive.  Brooke, in fact, was

13    generally supportive, but she knew she was not directing the

14    activities as well.

15          The evidence will show that Brooke did not always

16    agree with some of the progressive messaging put out by Zioness

17    on its Facebook page or in literature or in the news, but she

18    knew and recognized that she did not have any control over the

19    Zioness messaging.  In fact, the evidence will show that she

20    acknowledged that Amanda owned a trademark in the word

21    "Zioness."

22          By the end of 2018, Amanda was ready to devote her

23    full-time resources to Zioness Movement and leave The Lawfare

24    Project.  She informed Brooke in late November or early

25    December, and at the beginning -- at first, Brooke was

O35RZIO2                    Felicello - Opening

1    supportive of Amanda leaving to run Zioness full time.  The

2    evidence will show that she took her out for dinner.  She gave

3    her a hug.  You'll see an email, which she sent in mid

4    December, wishing Amanda the best, wishing her success in her

5    endeavor in this new organization.  And she placed no

6    conditions on Amanda's departure from The Lawfare Project.

7           Within a few weeks, however, by the end of December

8    prior to Amanda's last official day at The Lawfare Project,

9    which would have been December 31, Brooke had Ben Ryberg, the

10   COO of The Lawfare Project, turn off Amanda's access to her

11   email and her documents at The Lawfare Project.

12          The evidence will show that this was problematic.

13   Because remember I mentioned that Amanda was working on that

14   significant case for The Lawfare Project that was about to go

15   to trial in March of 2019.  Even after her planned departure

16   from The Lawfare Project, Amanda had agreed that she would

17   continue to work on that trial on behalf of the clients of the

18   Lawfare Project.  But in order to do that, she needed access to

19   her documents that were at the Lawfare and on The Lawfare

20   Project servers.  And in fact, Lawfare Project's cocounsel in

21   that important trial in San Francisco was Lawrence Hill --

22   sorry, counsel was Winston Strong, which was the law firm that

23   the then chairman of the Lawfare Project, Lawrence Hill, was

24   associated with.

25          So let me just be clear about that.  We have Lawrence

O35RZIO2                     Felicello - Opening

Hill, who was then the chairman of the board of The Lawfare

Project.  He was also a partner at a law firm called Winston

Strong.  Winston Strong was the large law firm that was

cocounseling on The Lawfare Project on the San Francisco State

litigation that was going to trial in March 2019.  His firm,

his partners, desperately wanted Amanda to continue working on

the trial.  And so, he expressed objection to Brooke about

shutting down Amanda's access to her email.  And you'll see

this in evidence.  There are emails showing his disagreement

with Ms. Goldstein.  In fact, the evidence will show that the

dispute was so untenable that Mr. Hill resigned from the board

of directors at The Lawfare Project over Brooke's actions

against Ms. Berman.

          But all of this also shows that the evidence -- sorry.

The evidence also shows that none of these issues that Brooke

professed to have against Amanda at the end of December 2018,

and her reason for cutting off her access to the email, had

anything to do with the trademark.  They had nothing to do with

the trademark.  There was no emails or text messages or any

documentary evidence from Brooke in this time period expressing

any concern about Amanda leaving Lawfare Project to run Zioness

or her use of the Zioness mark.

          In fact, Brooke did not assert that The Lawfare

Project had a superior right to the Zioness trademark until

months after the San Francisco state case settled, which was in

O35RZIO2                        Felicello – Opening

1    the spring of 2019.  The evidence will show that it wasn't

2    until June of 2019, about six months after Amanda Berman left

3    her employment at The Lawfare Project, that The Lawfare Project

4    added to its website the language that it founded, incubated

5    and funded the Zioness Movement.  The Lawfare Project website

6    did not include this language in 2017, and it did not include

7    this language in 2018.

8           The evidence will also show that Zioness Movement

9    never mentioned to its bookkeeper or accountant or auditor that

10   it had a trademark or any trademark rights at all to include in

11   the books and records of The Lawfare Project.

12          Despite this evidence that I described that you will

13   see and hear through trial, Lawfare would like you to find that

14   it first used the mark Zioness as a brand identifier in

15   August 2017, continued to use it and did not abandon it.  The

16   facts as will be shown in the evidence just do not support The

17   Lawfare Project's claims.

18          The evidence will show that in August 2020, about a

19   year after The Lawfare Project added the statement to its

20   website, Brooke calls The Lawfare Project to file a petition to

21   cancel the Zioness Movement's trademark in the U.S. Patent and

22   Trademark Office.  This is an administrative proceeding with

23   more limited discovery and more limited damages that can be

24   achieved.  It's simply an injunctive order that can be received

25   that the mark is either canceled or not canceled.

O35RZIO2                        Felicello - Opening

1          Also, a few months later in October 2020, the evidence

2     will show that the Twitter handle @TheSmartZioness appeared.

3     This handle sometimes wrote messages that were critical of

4     Zioness Movement and other times claimed to be Zioness

5     Movement, and sometimes wrote messages that were critical of

6     just of Amanda Berman.

7          After The Lawfare Project refused to meaningfully

8     participate in the discovery process in front of the United

9     States Trial and Patent Appeal Board, which is the PTAB in

10    which they filed a petition to cancel, and because of the

11    existential threat to the organization of canceling the word

12    "Zioness" or "Zioness Movement," Zioness was forced to come to

13    this Court and file this claim.  That would cover for the

14    continuing infringement and the reputational harm that The

15    Lawfare Project was causing by continuing to claim that it

16    founded, incubated and funded Zioness Movement.

17         The evidence will show that Zioness Movement has spent

18    significant sums on legal fees to defend against this

19    Lawfare -- unleashed by The Lawfare Project against its former

20    employee.  Zioness Movement seeks to recover for the harm

21    caused to The Lawfare Project to the Zioness brand and

22    reputation.

23         Zioness is unapologetically progressive.  You'll see

24    that in the evidence.  You'll also see in the evidence that is

25    the polar opposite of the values expressed by Brooke Goldstein

O35RZIO2                    Solomon - Opening

and associated with her organization, The Lawfare Project.  But

improperly claiming ownership and founding the Zioness Movement

on The Lawfare Project's website, Brooke has maligned the

reputation of Zioness by associating it with conservative

views.

On behalf of Zioness Movement, I thank you for your

service and your time.  Thank you very much.  I'll be back to

speak to you at the end of the trial.

THE COURT:  Defense opening.

MR. SOLOMON:  Good afternoon.  My name is Aaron

Solomon.  I'm a partner at the law firm of Oved & Oved, and

with me today, my partner Darren Oved and my associate, Tim

Savitsky.  We represent The Lawfare Project.  We start off by

thanking you-all for taking time away from your families, your

jobs and everything you have going on, and focusing on the two

parties in this case and helping us come to a resolution.

As you've heard from opposing counsel, no one disputes

that the trademark Zioness was used for the first time in

August 2017.  But by who?  Who used it first in commerce?  You

just heard from opposing counsel that their position is there's

no connection between the use of the word "Zioness" on

August 12, 2017, at the Chicago SlutWalk, which sounds as weird

for me to say in court as it is for you to hear, there was no

connection between the two whatsoever.

The reality is the term "Zioness" was a mark, a

1    trademark, that was cultivated, incubated, funded and done, for

2    lack of a better word, by Lawfare.  Let's back up to the summer

3    of 2017.  Lawfare is a not-for-profit organization.  Its

4    mission is to fight anti-Semitism, and it does it in many

5    different ways.  It's a civil rights organization protecting

6    the minority people, Jewish people.  How does it do it?

7    Sometimes it files lawsuits on behalf of plaintiffs; people who

8    feel they have personally experienced anti-Semitism.  It does

9    speaking engagements.  It does grassroots movements.  It does

10   communications and education.  There are a myriad of ways it

11   does what it is, but what it does is fight anti-Semitism.

12            The executive director for all the time it matters,

13   from inception to today, is Brooke Goldstein.  She's the

14   executive director of The Lawfare Project.  What does that

15   mean?  She sets the agenda.  What projects are we going to do?

16   How are we going to do them?  Who is going to do them?  Tells

17   people what to do.  We will do this.  I want this by Monday.  I

18   want this by Tuesday.  I want to have this ready by Monday.

19            (Continued on next page)

20

21

22

23

24

25

O354ZIO3                          Solomon - Opening

1              MR. SOLOMON:  She gives deadlines.

2              In summer of 2017 you have Brooke Goldstein, and

3      you'll meet her.  You have Amanda Berman, she is the director

4      of legal affairs for the Lawfare Project.  And you have Ben

5      Ryberg.  He is the COO.  He handles websites.  He handles

6      payment of bills.  He's integral as well.

7              As opposing counsel mentioned, 2017 in the summer

8      there was an event happening in Chicago called The SlutWalk.

9      It was a march designed to demonstrate against violence against

10     woman, sexual abuse, rape culture, domestic violence.  But

11     there was an issue, and antisemitic issue which was that while

12     that group allowed certain cultures and certain people to bring

13     their national symbols, their flags, the Jewish people weren't

14     allowed to bring their flags.  That was a problem for The

15     Lawfare because it fit directly with what The Lawfare does, it

16     fights antisemitism, that was a problem for Brooke Goldstein.

17             While opposing counsel may make it sound like Brooke

18     and Amanda just went to the SlutWalk.  They just went there

19     like you would go to the Yankee game tonight.  They didn't.

20     The reality is it wasn't casual.  Lawfare, before the SlutWalk,

21     which is August 12, 2017, begins a campaign.  What do they do?

22     They a PR company already in place that public relations

23     company is called Miller Inc.  What they do is they go back to

24     Miller Inc., that Lawfare has an engagement letter with and

25     that Lawfare pays and says, we're doing a new campaign.  We

need a word for it.  We need a term to bring to this March.

And they have a new arrangement with the PR company.  Who has

that arrangement?  Lawfare.  Who pays that company?  Lawfare.

        And the first thing that PR company does is they try

to come up a term, a word for Lawfare to use at this March.

One word that's generated is "Zioness."  Brooke responds

immediately in an email, love it.  Love it.  Amanda responds

she likes it to.  But she would prefer "Zioness Slut."

Amanda's response is, in sum and substance, that may not be

going over so well with the ACLU and some other things.  More

importantly, we want this term, this logo, this name, to live

beyond this march.  We want to use it in connection with other

stuff Lawfare does.  We don't want to do just go to this march,

the SlutWalk.  Zioness Slut, SlutWalk that's a one-and-done.

We want this to be used in connection with all of the

progressive things that Lawfare does.

        Because contrary to what you are going to hear,

Lawfare is a not-for-profit organization that fights

antisemitism.  It is not conservative, liberal, progressive,

right wing, left wing.  It fights antisemitism.  The people who

work there have their own beliefs.

        And it is true and everyone recognized that Brooke

Goldstein has appeared on conservative media outlets.  She has

been on Fox News.  So recognizing that, and from day one, there

was to be some sort of separation between Lawfare publicly and

the Zioness term.  But we'll get into that in a few minutes.

First, let's go back.  You have Miller Inc. creating the mark.  You got Lawfare paying for it.  Then you have the idea, not only do we want to bring a term to this march, we want to bring posters.  We want to have T-shirts.  Who doesn't love T-shirts, right?  So what are they going to do, they hire a creative design company.  Who hires them?  Lawfare.  Who pays them?  Lawfare.  The creative design company comes up with different designs, images.  Brooke edits them.  Brooke gives final approval.  Brooke gives deadlines.  Brooke critiques them.  Brooke makes the final decision.

Now, the next thing that happens is a website, let's have a website, Zioness.org.  Who registers it?  Lawfare.  Who pays for it?  Lawfare.  The company who registered it with --
excuse me, not the company who registered it, the company that hosts it, I'm not a web guy.  The company who hosts it is Wix.com, that's the platform.  The invoices from Wix.com goes to Ben Ryberg at Lawfare.  Lawfare registers the domain name, Zioness.org  The password for anyone to edit that domain name, Lawfare.

And before they go to the SlutWalk, Lawfare wants to issue a statement, a press release to its donors to its supporters, to anyone who might want to be interested in going to going to this or to get attention to it.  So they have the PR company draft one of those too.  Who edits it?  Brooke.  And

O354ZIO3                     Solomon - Opening

1   Brooke's edits are very important.  She edits it to say, put

2   something in about Lawfare.  So you'll see that the

3   introduction the world gets, the press release the world gets

4   about Zioness includes -- and I think it's Paragraph 2 -- if

5   you love Lawfare, check out its new project, Zioness, that's

6   the sum and substance of it.

7            And Amanda puts that edit in for Brooke.  Why?

8   Because Brooke is the boss.  So when Brooke says, that's the

9   edit that should go in, there is colloquy, but Brooke has the

10  final say on what goes in.  And that's on August 6, 2017, the

11  press release goes out to Lawfare's contacts.  Amanda sends

12  that email, that's true, to Lawfare's contacts, which she has

13  access to because she is a Lawfare employee.  She sends it from

14  her account, @Lawfare.com.  The bottom email has her signature

15  block, Amanda Berman, Lawfare.com.

16           Now, armed with these T-shirts, posters, the slogan,

17  "Zioness," Amanda and Brooke go to the SlutWalk in Chicago on

18  August 12, 2017.  They fly out there -- because we are in New

19  York, it's in Chicago -- with tickets paid for by Lawfare.

20  They stay in a hotel paid for by Lawfare.

21           And it is a hit.  This movement gets attention.  And

22  this whole time and thereafter everyone is looking to Brooke

23  for direction.  She makes edits.  She sets the agenda.  She

24  gives deadlines.

25           As I said before right off the bat, everyone knew this

O354ZIO3                        Solomon - Opening

progressive campaign can't really have Brooke be the frontman

of it or front person of it because Brooke has been on Fox

News.  It might not be very normal to have a Fox News talking

head at a march with progressive issues.  So that's discussed

openly.  And the decision is made that Amanda -- while Brooke

is the showpiece and the spokesperson for Lawfare, Amanda will

be the public figurehead of Zioness.

         September 2017, now that this thing is something that

they need to protect, they discuss with their *pro bono*

attorneys, Winston & Strawn.  Lawfare has *pro bono* counsel.

Why?  It's an organization that does philanthropic things.

Winston & Strawn has agreed to do work for them for free.  They

reach out to their contact at Winston & Strawn and say, we have

this trademark, what can we do?  He goes at least you can put a

TM on it, trademark, write that on there, and we will help you

guys register the trademark.  Who is the client going to be?

Lawfare.  Amanda is on that email, she says nothing because

Lawfare is running this project.  This is a project of The

Lawfare.

         Now, we have T-shirts.  We have posters.  We are going

to do other marches.  We need donations.  So people who want to

donate are going to click on a PayPal button and send money in.

But whose PayPal account is it?  Lawfare's.  So the same issue

comes up, wait a second, the people who are really super-duper

progressive may not want to donate to Lawfare.  Maybe they

will, maybe they don't.  What do we do?  And it's discussed

between Amanda, Brooke, the PR company, and Ben.  And Amanda

says, yeah, it's not ideal that there would be a Lawfare

receipt you'd get when you want to donate to Zioness, you get a

Lawfare receipt.  But in her words, she is OK with it because

it is definitely a project of The Lawfare.

          Around October of 2017 there is chatter online

regarding Brooke being involved in the Zioness movement.  The

Zioness movement is pitched, from the get-go, as having

co-founders.  Amanda is one of them.  No one ever says who the

other one is.  You know, why?  Because it's Brooke.  But the PR

company says, listen, we need to have a public face to this.

We have to disassociate Brooke from this.  So now we have the

issue is we need to get donations, we can't really have Brooke

be the figurehead, what should we do?  We'll start a new

501(c)(3), a new charity to receive the donations from the

Zioness project.  No problem.

          But here is the deal, Lawfare owns the trademark they

already do.  It exists the minute it's used in commerce.  So

Brooke agrees with Amanda, you can use it.  It's a great

project.  You're doing great work.  Keep doing your job at

Lawfare, which is going to be this Zioness project amongst

other things.  Everyone wears many hats.  Keep doing it.

Lawfare will let you use it and give you a license for the

trademark -- although no one calls it a license because we're

 1   not trademark attorneys.  We'll let you use the trademark, but
 2   you've got to do two things.  One, this new company, when it
 3   starts making money, has got to pay us back for the money we
 4   shelled out to get this off the ground because we are not going
 5   to make any more money off it.  And two, you got to fly
 6   straight.  We don't control you directly, but you've got to do
 7   stuff The Lawfare would be OK with.  Yes, you are progressive.
 8   We know that.  God bless you.  But you can't go off the rails.
 9   We have a license.  You have to listen to us, that's the deal.
10   And a new 501(c)(3) is formed beginning in February 2018, and
11   Brooke does what she does.  She doesn't lose interest, she
12   moves on to the next project.  Amanda's in place.  She's taking
13   care of it.  She's got it.  What is the next thing we have to
14   fight?  What's the next injustice we have to take care of?
15           Now, towards the end of 2018, Brooke and Amanda do
16   butt heads because Brooke is the boss of Lawfare.  She doesn't
17   like everything that Amanda is doing with Zioness.  That's the
18   occupational hazard of being the boss, people don't like being
19   told what to do.  So they start butting heads and in the end of
20   2018 Amanda decides she is quitting.  She's leaving.  She does,
21   and that's OK.  That's fine.  She is going to run Zioness,
22   which is that's fine.  She's devoted so much of her time to it
23   anyway, what's the difference?  Fine.  No problem.  But the
24   deal doesn't change.  Lawfare owns the trademark.  We're
25   letting you use it.  You've got to pay us back and fly

O354ZIO3                    Solomon - Opening

straight.

          But then they start going through emails and they find

out, because Amanda wouldn't turnover her work product, that

unbeknownst to Lawfare, she filed the trademark for Zioness in

the name of the new company.  Now, it's true we didn't file a

petition to cancel her trademark application right away.  We

didn't put opposition right away because we are a

not-for-profit.  This is a waste of a not-for-profit's money,

being here.  Our job is to take the donations we get and fight

antisemitism, not fight trademark disputes with our former

employees.  We tried to resolve it.  We sent not one, not two,

not three, but four cease-and-desist letters to her.  She won't

stop.

          In the end, she files a statement of use, "she" being

Amanda.  What does that mean?  When you file a trademark there

is different kinds of trademarks you could file.  One of them

is an intent to use.  I'm going to use it in the future, I want

to hold it.  That's what she files.  That's what Amanda files,

an intent-to-use application.  So at some point you have to

file the I'm-now-using-it application, and she does.  You know

what date she picks for the date that this new company used,

the new company that's called Zioness Movement Inc., what's the

date that Zioness Movement Inc. says is the first time they

used the trademark Zioness?  August 12, 2017, at the SlutWalk

before it existed and when Lawfare was funding it, running it,

it.  Was a project of The Lawfare.

        At some point because of this, Lawfare's donors start
questioning Brooke.  It's not just the public who has this
question, who really is Zioness?  Who is really the front of
it?  Their own donors start questioning it.  So Brooke puts on
the Lawfare web page that it was a project of Lawfare.  Do you
know why?  It was.  They claim it's infringement to do so.  We
incubated the project.  We started it.  We paid for it.  We ran
it until we handed the reins to Amanda with our license.
That's one of their claims.  They are mad about that.

        The other one is that Brooke, at some point, starts a
Twitter account, a so-called Twitter, with hashtag Smart
Zioness.  Why?  She is critiquing things Amanda is doing,
thinks Amanda is making mistakes.  It's America, we can
critique people.  That's why we are here.  We are here because
who owns the trademark?  Zioness is listed on Lawfare's website
as being a project of The Lawfare, which Amanda admitted it is,
and because Brooke has a Twitter handle.  That's why we are
here.

        So when this is all said and done, we are going to ask
you to declare the trademark belongs to Lawfare and that there
is no infringement for either Lawfare putting on the website
that it started the campaign it started, Zioness, or that
Brooke's use of the hashtag a Smart Zioness constitutes
infringement when it really is just critique.

O354ZIO3                          Solomon – Opening

 1              Thank you or all for your patience.  Thank you for
 2      your time.  We will try to make the trial as quick as possible.
 3      Thank you very much.
 4              THE COURT:  Thank you, Counsel.  Thank you, members of
 5      the jury.
 6              The opening statements were outlines from the lawyers
 7      of what they expect to prove.  The openings are not evidence
 8      themselves.  It is a picture of what the lawyers expect to do
 9      with the evidence.
10              Tomorrow morning we will start with the evidence.  I
11      will see you at 10:00 in the morning.  Ms. Jones will collect
12      your notebooks and give them back to you in the morning.  Don't
13      discuss the case, keep an open mind.  You are excused for the
14      day.  Go out into the jury room.
15              I'll see you tomorrow.  Thank you.
16              (Adjourned to March 5, 2024 at 10:00 a.m.)
17
18
19
20
21
22
23
24
25